J-S40001-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.R.B., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.E.J., MOTHER | : : : : : : : | No. 2879 EDA 2016 |

Appeal from the Decree August 18, 2016
in the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000633-2016,
CP-51-DP-0002348-2014, FID: 51-FN-002147-2014

BEFORE: OTT, DUBOW, JJ., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED JULY 06, 2017**

Appellant, D.E.J. ("Mother"), files this appeal from the decree entered August 18, 2016, in the Philadelphia County Court of Common Pleas, granting the petition of the Department of Human Services ("DHS") and involuntarily terminating her parental rights to her minor, dependent son, K.R.B. ("Child"), born in December 2012, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1] Mother further appeals the order entered August 18, 2016, changing Child's permanency goal to

_____

[*] Former Justice specially assigned to the Superior Court.

[1] By separate decree on the same date, the trial court involuntarily terminated the parental rights of A.B. ("Father") and Unknown Father with respect to Child. An appeal has not been filed by Father or any previously unknown father, nor are they parties to the instant appeal.

adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[2]  After review,

we affirm the trial court's decree and order.

The trial court summarized the relevant procedural and factual history

as follows:

> On September 8, 2014, [] Mother was admitted to Mercy Philadelphia Hospital for mental health treatment.  The Department of Human Services (DHS) learned Mother was hospitalized due to her failure to take her medication.  Mother had not taken medication since her discharge from Friends Hospital which took place at the end of August 2014.  Mother was reportedly in her apartment for four days, yelling, talking and cursing at herself, hitting the walls.  Mother was found to be in very poor hygiene.  There were concerns for [Child]'s safety and specifically how Mother was physically handling him.  DHS learned that Mother was irritable, argumentative, disorganized, malodorous and unstable.  Mother had previously been admitted to Mercy Hospital for mental health treatment from October 20, 2013 to December 20, 2013.  Mother was readmitted to Mercy Hospital for mental health treatment from March 2, 2014 to March 5, 2014, July 2, 2014 to August 5, 2014 and from August 20, 2014 to August 21, 2014.  These periods of hospitalization occurred because of episodes that ensued from Mother not taking her medications.  Mother was supposed to attend a

_____

[2] While Mother appealed the goal change, Mother did not preserve this claim for appeal as she failed to (1) raise the issue in her concise statement of errors complained of on appeal, (2) include the issue in her statement of questions involved in her brief, or (3) present argument thereto in her brief. Thus, we find Mother has waived any claim regarding the goal change. **See Krebs v. United Refining Co. of Pennsylvania**, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues); **In re W.H.**, 25 A.3d 330, 339 n.3 (Pa.Super. 2011) (citation omitted) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived").

psychiatric outpatient clinic at Mercy Hospital. Mother did not attend nor would she take her medication. Mother admitted to smoking marijuana on a daily basis, and declined to give a urine sample.

On September 17, 2014, DHS received a General Protective Services (GPS) report which alleged that Mother had mental health issues and was unable to provide appropriate supervision for [Child], who was 21 months old. [Child] was residing with his maternal grandmother due to Mother's mental illness. [Child] was removed from Mother's care by Philadelphia Police because she had a psychotic episode which placed [Child] at risk. The report alleged that Mother was admitted to Mercy Philadelphia Hospital for mental health treatment. Maternal [G]randmother sought custody of [Child] due to concern Mother had threatened to physically harm Maternal [G]randmother when she was discharged. The report stated concerns Mother would not take her medication and would fall back into a psychotic state. Mother refused to allow the hospital to provide her with monthly injections, which would ensure that the medication was in her system. The report further alleged that Mother would be moving from her apartment during the weekend of the report. It was reported that it was unknown where Mother was moving. Mother was diagnosed with manic depression and/or bipolar disorder and a history of not taking her medication. The report was substantiated.

On September 18, 2014, DHS visited Maternal [G]randmother's home to see [Child]. DHS completed an assessment of the home of Maternal [G]randmother. DHS determined the home was safe for [Child] with operable utilities, appropriate sleeping arrangements and ample food for [Child]. DHS learned that [Child] had been residing with Maternal [G]randmother while [M]other was in the hospital.

On September 18, 2014, DHS learned that Mother would be discharged from the hospital on the same day and that there was a safety concerns for [Child].

On October 1, 2014, Maternal [G]randmother contacted DHS via telephone to report Mother was at her home behaving erratically. Maternal [G]randmother requested DHS speak with Mother about placing temporary custody with Maternal [G]randmother instead of placement with DHS. Maternal [G]randmother telephoned the Philadelphia Police to report

- 3 -

Mother's erratic behavior. DHS spoke with the Philadelphia Police who confirmed Mother's erratic behavior. DHS went to Maternal [G]randmother's home to speak with Mother. There were six or seven police officers at the home when DHS arrived. DHS explained to Mother that [Child]'s safety was their main concern. DHS wanted Mother to allow Maternal [G]randmother to care for [Child]. The alternative plan required DHS to take custody of [Child]. Mother agreed to allow Maternal [G]randmother to care for [Child] and all parties signed a Safety Plan.

Mother was diagnosed with manic depression, bipolar disorder, and paranoid schizophrenia. Mother refused to take her medication, and was uncooperative with services.

Mother had a history of substance use and was not receiving treatment. [Child]'s [f]ather was incarcerated.

At the Adjudicatory Hearing held on October 27, 2014 for [Child], the [c]ourt adjudicated [Child] dependent and committed him to DHS. Mother was referred to Behavioral Health System (BHS) for consultation, evaluation and monitoring. Mother was ordered to sign consents for her mental health evaluation.

On January 26, 2015, the [c]ourt ordered Mother to continue therapy through the Community Organization for Mental Health and Retardation (COMHAR), to comply with medication management and to continue parenting classes. The [c]ourt ordered the Community Umbrella Organization (CUA) to refer Mother to the Achieving [R]eunification Center (ARC) program for appropriate services and ordered Mother to comply with all services and recommendations.

On April 13, 2015, [t]he court re-referred Mother to BHS for consultation and evaluation, and ordered Mother to comply with ARC and mental health.

On July 7, 2015, the [c]ourt referred Mother to BHS for monitoring. On July 21, 2015 an Initial Single Case Plan (SCP) was created. The objectives for Mother were to participate in Northeast Treatment Centers (NET) CUA services and recommendations; to comply with supervised visitation in the grandmother's home; to comply with NET services; to establish mental health stability; to re-engage drug and alcohol sobriety; and to comply with CEU for drug/alcohol recommendations. The

objectives for Father were to participate in NET CUA services and recommendations provided; and to make his whereabouts known to the CUA worker.

On October 6, 2015, it was reported Mother was in need of housing and anger-management. The [c]ourt ordered Mother to attend COHMAR consistently, and referred Mother to BHS for consultation/evaluation and monitoring.

On January 4, 2016, it was reported that Father was incarcerated. The [c]ourt ordered Mother to continue working on SCP objectives and referred Mother to CEU for a full drug and alcohol screen assessment and random drug screen prior to the next court date.

On March 21, 2016, it was reported Father was incarcerated at State Correctional Institute (SCI) Frackville. The [c]ourt re-referred Mother to CEU for an assessment and a screen with three randoms and referred Mother to BHS for consultations and evaluations.

On April 25, 2016, and May 5, 2016, Mother tested positive for marijuana.

The matter was listed on a regular basis before Judges of the Philadelphia Court of Common Pleas, Family Court Division-Juvenile Branch pursuant to [S]ection 6351 of the Juvenile Act, 42 [Pa.C.S.A.] § 6351, and evaluated for the purpose of reviewing the permanency plan of the child.

In subsequent hearings, the Dependency Review Orders reflect the Court's review and disposition as a result of evidence presented, primarily with the goal of finalizing the permanency plan.

Trial Court Opinion (T.C.O.), 3/6/17, at 1-3.

DHS filed petitions to terminate parental rights and for a goal change on July 18, 2016. At a combined hearing on August 18, 2016, DHS presented the testimony of Andre McKnight, CUA 7 NET case manager. Additionally, Mother testified on her own behalf. Father, who was incarcerated and not present, was represented by counsel.

Following the hearing, on August 18, 2016, the trial court entered a decree involuntarily terminating the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and an order changing Child's permanency goal to adoption.[3] On September 6, 2016, Mother, through appointed counsel, filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[4]

On appeal, Mother raises the following issues for our review:

1. Whether the trial court committed reversible error when it involuntarily terminated mother's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8)[?]

2. Whether the trial court committed reversible error when it involuntarily terminated mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical, and emotional needs of the child as required by the Adoption Act, 23 Pa.C.S.A. § 2511(b)[?]

Mother's Brief, at 7.

_____

[3] This decree and order memorialized the decision placed by the court on the record at the conclusion of the hearing.

[4] Our Supreme Court has instructed this Court to explain repeated delays in the appeal process in Fast Track Cases, which are given "priority in both circulation of and voting on proposed decisions." *In re T.S.M.*, 620 Pa. 602, 618, 71 A.3d 251, 261 n. 21 (2013) (citing Superior Court Internal Operating Procedures § 65.42). We note that this Court was delayed five months in setting a briefing schedule for this case due to the late submission of the certified record by the Court of Common Pleas. Although the certified record was originally due in this Court by October 6, 2016, this Court did not receive the record until March 7, 2017, despite this Court's repeated attempts to facilitate prompt processing of this appeal.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." **In re Adoption of S.P.**, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." **Id.** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Id.** The trial court's decision, however, should not be reversed merely because the record would support a different result. **Id.** at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. **See In re R.J.T.**, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

**In re T.S.M.**, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re M.G. & J.G.**, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." **In re Adoption of T.B.B.**, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination as well as the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating

parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). As a result, we analyze the court's termination decree pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

>(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>. . .
>
>**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

>In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met:  (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the

contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (citation omitted).

Mother asserts that DHS failed to show termination was proper under Section 2511(a)(2) as she was compliant with her SCP objectives, kept continued contact with Child, and took actions to bolster their relationship. Further, Mother indicates she increased her parental skills, did not abuse and/or neglect Child, made efforts toward reunification, and showed a willingness to perform parental duties. Mother argues that "[t]hroughout the life of this case, [she] has proven she is able to provide the child with essential parental care, control, and subsistence necessary for his physical and mental well-being." Mother's Brief, at 26-27. We disagree.

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2). The trial court observed that as of the date of the termination hearing, Child had been in care for at least twenty-two months, and yet "Mother failed [to] meet her Single Case Plan (SCP) permanency objectives in a way that would permit reunification to occur." T.C.O. at 5. Mother's established SCP objectives were to complete drug and alcohol treatment, seek mental health treatment, maintain visitation with Child, obtain adequate housing, and to comply with ARC services related to job readiness and anger management. Notes of Testimony (N.T.), 8/18/16, at 14.

Mr. Andre McKnight, CUA case manager, acknowledged that Mother was aware of her SCP objectives. Mr. McKnight indicated that he reviewed the objectives with Mother "[e]very time we have a single case plan. As of recently when she comes up to the office to do her visits, we'll go over the single case plan. So the last single case plan we probably went over three times." *Id.* at 34.

However, Mr. McKnight last described Mother's compliance with her objectives as "minimal."[5] *Id.* at 37. As to the ARC requirements, while Mother completed job readiness and had only one more anger management class to complete, she was in a new home that had yet to be assessed. *Id.* at 14-15, 21. Notably, as reported by Mr. McKnight, this was the third time Mother had been referred to ARC. *Id.* at 36. Further, although Mother maintained consistent visitation, visitation remained supervised. *Id.* at 20-21, 35-36. After commencing as supervised, visits progressed to unsupervised in mid-2015. However, after Mother was in an altercation involving a knife with a family member in December 2015, Mother was restricted to supervised visits. *Id.* at 35, 43.

Moreover, and most significantly, Mr. McKnight testified to his continuing concerns regarding Mother's mental health and substance abuse. *Id.* at 34-35. Mother was diagnosed with manic depression, bipolar disorder,

---

[5] Initially, Mr. McKnight had assessed Mother's compliance as "substantial," before correcting his response to "moderate." N.T. at 21-22.

and schizophrenia, and had been hospitalized on repeated occasions for significant periods of time for mental health-related issues. N.T., at 31-33, 40; DHS Exhibits 5 and 6. While Mother received mental health treatment at COHMAR, not only was her treatment inconsistent, no documentation was offered to establish Mother was actively engaged in treatment.[6] N.T. at 17, 32, 33, 50-51, 53-55. Moreover, Mother's periods of hospitalization were a result of her consistent refusal to take her antipsychotic medication; Mother even refused to allow the hospital to provide her with monthly injections, which would ensure that the medication was in her system. *See S.C.B. and J.G.B.*, 990 A.2d 762, 771 (Pa.Super. 2010) (finding the mother's repeated psychiatric hospitalizations and unstable mental health showed she was incapable of parenting her young children and provided support for the termination of her parental rights under Section 2511(a)(2)).

In addition, Mother never successfully completed drug and alcohol treatment. N.T. at 34. Although Mother commenced drug and alcohol treatment at NET, she failed to present for drug screens. *Id.* at 15-16, 20.[7] Critically, when Mother did submit to testing, her last four drug screens from

---

[6] Mother testified to current treatment at COMHAR. N.T. at 50-51. However, critically, the Community Behavioral Health ("CBH") representative, Dana Carlomagno, who was present at the hearing, stated that Mother "lost her eligibility with CBH as of July 31, 2016." *Id.* at 17.

[7] Mother claimed she was not sent for drug screens. *Id.* at 27, 51.

April and May 2016, prior to were positive for marijuana.[8] *Id.* at 16. *See also* DHS Exhibit 8.

As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy her incapacity to parent within a reasonable amount of time. As a result, we agree with the trial court's determination that DHS presented sufficient grounds for the termination of Mother's parental rights under Section 2511(a)(2).

As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we,

---

[8] Mr. McKnight confirmed Child's half-sibling was born positive for substances and placed in the care of Maternal Grandmother. N.T. at 37.

therefore, need not address any further subsections of Section 2511(a).  *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b).  Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S. § 2511(b).  The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability."  *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012).  In *In re E.M. [a/k/a  E.W.C. & L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child.  The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.  *In re K.M.*, 53 A.3d at 791.  However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267.  "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case."  *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony.  Social workers and caseworkers can offer evaluations as well.  Additionally, Section 2511(b) does not require a formal bonding evaluation."  *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

Mother argues that termination does not serve the needs and welfare of Child as Mother maintained visitation with Child and contact and communication with CUA; she avers she conveyed her interest in and desire for reunification. Further, while Mother asserts that DHS failed to refute the existence of a bond between Mother and Child, she blames DHS for her inability to strengthen her bond with Child, as DHS failed to provide reasonable efforts toward reunification. *Id.* at 31-32. She alleges that:

> [t]he failure of the CUA worker and DHS to make reasonable efforts toward full and proper reunification interfered with Mother's ability to further strengthen her emotional bond with the child. The child's developmental, physical, and emotional needs and welfare suffered as a result of DHS's failure to make reasonable efforts. Mother's ability to deepen and strengthen the bond between her and the child was limited by the actions, or lack thereof, of DHS. Mother should not have been left without direction to complete her objectives and should have been reasonably guided on the necessary steps she needed to take in order for reunification to occur.

*Id.* at 32. Again, we disagree.

Upon review, the record supports the trial court's finding that Child's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of Child's needs and welfare, and as to the existence of a bond between Mother and Child that, if severed, would not have a detrimental impact on him.

The trial court emphasized that Child was taken from Mother's care when he was twenty-two months old. Nearly two years later, Mother had failed to make progress to address her mental health and substance abuse and move towards reunification, leaving Child without proper parental care and control. Mother's case manager, Mr. McKnight testified that Child cannot be safely returned to Mother, expressing concern as to Mother's mental health, substance abuse, and stability.[9] N.T., at 34-35, 37-38. Further, Mr. McKnight opined that termination of Mother's parental rights would not "harm [Child] beyond repair." *Id.*

Significantly, he indicated that Child does not depend on Mother for day-to-day needs, but relies on Maternal Grandmother, with whom he has been placed since October 2014.[10] *Id.* at 5, 30-32. Moreover, Mr. McKnight

---

[9] Mother had recently been incarcerated on charges of retail theft. *Id.* at 37, 40. *See also* DHS Exhibit 9.

[10] Child's half-sibling, who, as indicated, has since also come into care, was also placed with Maternal Grandmother. N.T., 8/18/16, at 5.

indicated that Child is bonded with Maternal Grandmother. *Id.* In so concluding, he explained, "He's very -- when you go see him in his home, he's very open with his grandmother. … [H]e plays with all the kids in the house. He's comfortable in the home." *Id.* at 38-39. As such, noting that Maternal Grandmother's home "will provide [Child] permanency through adoption," Mr. McKnight opined that adoption is in Child's best interest. *Id.* at 39.

Thus, as confirmed by the record, termination of Mother's parental rights serves Child's developmental, physical and emotional needs and welfare. While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decree and order affirmed.

Judge Ott joins the memorandum.

Judge Dubow recuses.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/6/2017